

This opinion was filed for record

at _8 a.m._ on _Feb 7, 2019_

SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |
|---|---|
| STATE OF WASHINGTON, | ) |
| Respondent, | ) No. 95632-4 |
| v. | ) |
| JOHN DOUGLAS MAYFIELD, | ) En Banc |
| Petitioner. | ) |
|  | ) Filed: __FEB 0 7 2019__ |

YU, J.—This case concerns an exception to the federal exclusionary rule known as the attenuation doctrine. The attenuation doctrine provides that evidence obtained in violation of the Fourth Amendment to the United States Constitution is not subject to the exclusionary rule if "the connection between unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance." *Utah v. Strieff*, 579 U.S. __, 136 S. Ct. 2056, 2061, 195 L. Ed. 2d 400 (2016). We are asked whether the attenuation doctrine is compatible with article I, section 7 of the Washington State Constitution and our state exclusionary rule.

We have repeatedly held that our state exclusionary rule is considerably broader than the federal exclusionary rule. Nevertheless, our exclusionary rule does not automatically require suppression of all evidence that would not have been discovered but for a prior violation of article I, section 7. Because our state exclusionary rule does not operate on a strict "but for" causation basis, it is not categorically incompatible with the attenuation doctrine. However, to comply with the heightened protections of article I, section 7, the attenuation doctrine must be narrow and apply only where intervening circumstances have genuinely severed the causal connection between official misconduct and the discovery of evidence.

It is clear that there were no intervening circumstances sufficient to satisfy the attenuation doctrine in this case as a matter of law. We therefore hold that petitioner John Mayfield's motion to suppress must be granted, and we reverse and remand to the trial court for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

On January 3, 2015, Derek Salte came home to find an unfamiliar truck parked in his driveway, with a man (later identified as Mayfield) asleep in the driver's seat. Salte told Mayfield to leave, threatening to call the police if he did not. Mayfield started the truck's engine and tried to put it in reverse, but the truck would not move. Eventually, Mayfield got out of the truck through the passenger

door and ran away, leaving the door open with the engine and windshield wipers still running. Salte called the police, and Deputy Andy Nunes responded.

Deputy Nunes turned off the truck's engine, placed the keys on the driver's seat, and closed the passenger door. He "did not search for or observe anything within the truck's passenger compartment." Clerk's Papers (CP) at 19. He then determined that the truck was registered to Mayfield and had not been reported stolen. Around this time, Deputy Nunes spotted Mayfield walking on the other side of the street, and Salte identified him as the person who was in the truck. Deputy Nunes believed that Mayfield was trying to walk past them without making contact, which Deputy Nunes thought was odd behavior for the truck's apparent owner. He therefore crossed the street to talk to Mayfield.

Mayfield initially said he was parked in Salte's driveway because he needed to use the restroom in the church next door but later said he was there because he was having vehicle problems. Mayfield explained that he ran away because he was afraid that Salte was about to assault him. At the suppression hearing, Deputy Nunes testified that he did not suspect Mayfield of committing any crime, of being under the influence of alcohol or other drugs, or of being armed or dangerous. Nevertheless, Deputy Nunes thought the situation seemed strange.

A second officer, Sergeant Corey Huffine, arrived to assist while Deputy Nunes asked for Mayfield's identification and checked for outstanding warrants.

3

No warrants were discovered, but Deputy Nunes learned that Mayfield "was a convicted felon, was on active [Department of Corrections] supervision, and had prior contacts in regards to controlled substances." *Id.*

Deputy Nunes then asked Mayfield about recent drug use, which Mayfield denied. Deputy Nunes asked for consent to conduct a pat-down search and told Mayfield he could refuse. Mayfield consented, and Deputy Nunes found $464 in cash, bundled in a way that made him suspect "the money was the result of drug transactions." *Id.* Deputy Nunes then asked for consent to search the truck, informing Mayfield he had the right to refuse and the right to limit or revoke his consent. Mayfield consented. Deputy Nunes discovered methamphetamine in the truck and arrested Mayfield.

Mayfield was charged with one count of possession of a controlled substance with intent to deliver. He moved to suppress the money and the methamphetamine, arguing that Deputy Nunes unlawfully seized him without reasonable suspicion and that his consent to search was vitiated by the unlawful detention. The State contended that the attenuation doctrine provided an exception to the exclusionary rule in this case.

The trial court concluded that Mayfield was unlawfully seized "when Deputy Nunes began asking questions about [his] drug use, whether he would have anything illegal on his person, and when he sought permission to conduct a pat-

4

down search." *Id.* at 20. However, the court denied the motion to suppress,

concluding that the evidence was attenuated from the unlawful seizure because

Deputy Nunes gave *Ferrier*[1] warnings before Mayfield consented to the search of

his truck. The court did not separately address the money discovered on

Mayfield's person, and the parties did not ask for clarification on that point. The

jury convicted Mayfield as charged.

On appeal, Mayfield argued that the attenuation doctrine is incompatible

with article I, section 7. In the alternative, he argued that *Ferrier* warnings alone

are insufficient to satisfy the attenuation doctrine. In a split opinion, the Court of

Appeals declined to reach Mayfield's state constitutional argument because he did

not conduct a *Gunwall*[2] analysis. *State v. Mayfield*, No. 48800-1-II, slip op. at 5-7

(Wash. Ct. App. Jan. 4, 2018) (unpublished), http://www.courts.wa.gov/opinions/

pdf/D2%2048800-1-II%20Unpublished%20Opinion.pdf. The majority further

held that the federal attenuation doctrine was satisfied "[b]ecause *Ferrier* warnings

were an intervening circumstance and there was not purposeful or flagrant police

---

[1] *State v. Ferrier*, 136 Wn.2d 103, 960 P.2d 927 (1998). *Ferrier* applies "when police officers conduct a knock and talk for the purpose of obtaining consent to search a home, and thereby avoid the necessity of obtaining a warrant." *Id.* at 118. To obtain valid consent, police must "inform the person from whom consent is sought that he or she may lawfully refuse to consent to the search and that they can revoke, at any time, the consent that they give, and can limit the scope of the consent to certain areas of the home." *Id.* Mayfield's case does not require us to determine whether *Ferrier* warnings are required where police seek consent to search a car, rather than a home, and we do not purport to do so.

[2] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986).

misconduct." *Id.* at 10. One judge dissented on the basis that "[a] *Gunwall* analysis is not required every time article I, section 7 is applied in a new context." *Id.* at 14 (Bjorgen, C.J., dissenting). We granted Mayfield's petition for review.

## ISSUES

A. Was Mayfield's argument that the attenuation doctrine is incompatible with article I, section 7 sufficiently briefed on appeal?

B. If Mayfield's state constitutional argument was sufficiently briefed, is the attenuation doctrine compatible with article I, section 7?

C. If the attenuation doctrine is compatible with article I, section 7, is it satisfied in this case?

## ANALYSIS

It is well established that article I, section 7 often provides broader protections than the Fourth Amendment. As such, we reaffirm that no *Gunwall* analysis is needed to justify an independent state law analysis of article I, section 7 in new contexts. Mayfield's appellate briefing was therefore sufficient, and his argument that the attenuation doctrine is incompatible with our state exclusionary rule should be considered on its merits.

Carefully and narrowly applied, the attenuation doctrine is not categorically incompatible with article I, section 7. However, we hold as a matter of independent state law that the attenuation doctrine can apply only where the State

6

proves that the causal chain between official misconduct and the discovery of evidence has been genuinely severed by intervening circumstances. That standard is not satisfied here, so Mayfield's motion to suppress must be granted.

A.    A *Gunwall* analysis is not required to justify an independent state law analysis of article I, section 7 in new contexts

In *Gunwall*, we set forth six nonexclusive factors to guide the threshold inquiry of "'whether, in a given situation, the Washington State Constitution should be considered as extending broader rights to its citizens than the United States Constitution.'" *Blomstrom v. Tripp*, 189 Wn.2d 379, 400, 402 P.3d 831 (2017) (quoting *Gunwall*, 106 Wn.2d at 58). In this case, Mayfield's appellate briefing did not include a threshold *Gunwall* analysis. We nevertheless hold that Mayfield sufficiently briefed his state constitutional claim and that he is entitled to have that claim considered on its merits.

We recognize that our cases have been somewhat unclear on the need to conduct a threshold *Gunwall* analysis. We therefore take this opportunity to reaffirm that no *Gunwall* analysis is required to justify an independent state constitutional analysis of article I, section 7 in new contexts.[3] Courts and parties

---

[3] We confine our holding to article I, section 7 and do not reach the broader question of whether a *Gunwall* analysis is needed to justify an independent state constitutional analysis of other provisions of the Washington State Constitution.

may assume an independent state analysis is justified and move directly to the merits of the article I, section 7 claim presented.

"It is well established that article I, section 7 qualitatively differs from the Fourth Amendment and in some areas provides greater protections than does the federal constitution." *State v. Chenoweth*, 160 Wn.2d 454, 462, 158 P.3d 595 (2007) (citing *State v. McKinney*, 148 Wn.2d 20, 29, 60 P.3d 46 (2002)). Therefore, we have previously held that when a new issue arises pursuant to article I, section 7, parties and courts are not required to conduct a *Gunwall* analysis before engaging in an independent state law analysis on the merits. *Id.* at 463 (citing *State v. Jackson*, 150 Wn.2d 251, 259, 76 P.3d 217 (2003)). Instead,

> "the focus is on whether the unique characteristics of the state constitutional provision and its prior interpretations actually compel a particular result." This involves an examination of the constitutional text, the historical treatment of the interest at stake as reflected in relevant case law and statutes, and the current implications of recognizing or not recognizing an interest.

*Id.* (citation omitted) (quoting *City of Seattle v. McCready*, 123 Wn.2d 260, 267, 868 P.2d 134 (1994)). This approach is reflected in several of our prior cases that considered federally recognized exceptions to the exclusionary rule on an independent state law basis without first conducting a *Gunwall* analysis. *State v. Afana*, 169 Wn.2d 169, 179-84, 233 P.3d 879 (2010) (rejecting the good faith exception); *State v. Winterstein*, 167 Wn.2d 620, 631-36, 220 P.3d 1226 (2009) (rejecting the inevitable discovery doctrine); *State v. Gaines*, 154 Wn.2d 711, 717-

8

22, 116 P.3d 993 (2005) (adopting the independent source doctrine). And in our most recent case to consider whether the attenuation doctrine is compatible with article I, section 7, both the lead opinion and the dissent addressed the merits without any *Gunwall* analysis. *State v. Eserjose*, 171 Wn.2d 907, 259 P.3d 172 (2011) (plurality opinion).

Mayfield's appellate briefing followed this precedent. He did not conduct a *Gunwall* analysis, but he presented argument and cited authorities supporting his specific claim that the attenuation doctrine is incompatible with article I, section 7 based on the constitutional text, relevant precedent, and the differences in history and purpose between our state exclusionary rule and the federal exclusionary rule. The State opposed Mayfield's state constitutional argument on the merits, without suggesting it was inadequately briefed or procedurally barred.[4]

However, the Court of Appeals declined to reach the merits, concluding that Mayfield's appellate briefing was insufficient because he did not conduct a *Gunwall* analysis. *Mayfield*, No. 48800-1-II, slip op. at 5-7; *see also State v. Witkowski*, 3 Wn. App. 2d 318, 339-41, 415 P.3d 639 (Sutton, J., concurring), *review denied*, 191 Wn.2d 1016 (2018). The majority's analysis implies that

---

[4] In its supplemental brief to this court, the State cites RAP 2.5 and notes that Mayfield did not raise a state constitutional argument at the trial court level. We nevertheless reach the merits of Mayfield's state constitutional argument because it is an important, unresolved question of law and the State did not raise RAP 2.5 until after we granted review.

*Blomstrom* reimposed a *Gunwall* requirement when applying article I, section 7 in new contexts. We clarify that it did not.

*Blomstrom* considered whether article I, section 7 allows random urinalysis testing to be imposed as a condition of pretrial release for individuals arrested for alleged driving under the influence. 189 Wn.2d at 383-84. The majority did conduct an abbreviated *Gunwall* analysis before turning to the merits. *Id.* at 401-02. However, it did not suggest that the failure to do so is fatal to an otherwise fully argued article I, section 7 claim, nor did it undertake the analysis required to reverse our precedent holding that *Gunwall* is unnecessary when applying article I, section 7 in new contexts. The parties in *Blomstrom* did not dispute the need for a *Gunwall* analysis, so this court did not make any holding on that issue.[5]

We reaffirm that a *Gunwall* analysis is not required to justify an independent analysis of article I, section 7 in new contexts. We also reaffirm that on the merits, it is not sufficient for parties to simply "mention our state constitution in their briefs" and note that article I, section 7 is often more protective than the Fourth Amendment. *State v. Rojo Armenta*, 134 Wn.2d 1, 10 n.7, 948 P.2d 1280 (1997). Parties must provide argument and relevant authorities supporting the specific

---

[5] Amicus objected to performing a *Gunwall* analysis in *Blomstrom* because, according to amicus, our precedent held that article I, section 7 is *not* more protective than the Fourth Amendment regarding the privacy rights of pretrial defendants. *Blomstrom*, 189 Wn.2d at 400 n.17. We conducted a *Gunwall* analysis over this objection, not because we intended to reimpose a *Gunwall* requirement but because amicus misread our precedent. *Id.*

outcome they seek in light of "the constitutional text, the historical treatment of the interest at stake as reflected in relevant case law and statutes, and the current implications of recognizing or not recognizing an interest." *Chenoweth*, 160 Wn.2d at 463. Mayfield did so, and we therefore consider his state constitutional argument on the merits.

B.    A narrowly applied attenuation doctrine is not categorically incompatible with article I, section 7

Article I, section 7 and its corresponding exclusionary rule provide uniquely heightened privacy protections. Unlike many other jurisdictions, the primary purpose of Washington's exclusionary rule is *not* to deter official misconduct under threat of suppression. Deterrence is a benefit of our state exclusionary rule, but its primary purpose is to protect the individual right to privacy and to provide a certain remedy when that right is violated. We have therefore adopted a broad exclusionary rule and rejected several exceptions recognized by other jurisdictions. Nevertheless, our precedent recognizes that our exclusionary rule does not operate on a strict "but for" causation basis. In narrow circumstances, evidence may be admissible even if the evidence likely would not have been discovered but for a prior article I, section 7 violation.

The underlying purpose of the attenuation doctrine is to prevent the exclusionary rule from operating on a "but for" basis, which is consistent with article I, section 7. However, a broadly applied attenuation doctrine allows the

11

State to benefit from the misconduct of its officials by failing to exclude illegally seized evidence, which is not at all consistent with article I, section 7. This tension has made it difficult to determine whether the attenuation doctrine applies as a matter of independent state constitutional law. In our most recent case to consider the question, three justices would have adopted the attenuation doctrine as applied by federal courts, four justices would have rejected the attenuation doctrine entirely, one justice concurred in result only, and one justice would not have reached the issue.[6] *Eserjose*, 171 Wn.2d 907. The applicability of the attenuation doctrine as a matter of state constitutional law therefore remains an open question.

After examining the history, purpose, and operation of the attenuation doctrine and our state exclusionary rule, we hold that they are not categorically incompatible with each other. However, we strongly caution that in order to comply with article I, section 7, the attenuation doctrine must be carefully and narrowly applied. The State must prove that intervening circumstances gave rise to a superseding cause that genuinely severed the causal connection between official misconduct and the discovery of evidence. If the State fails to meet its burden then the attenuation doctrine cannot apply, regardless of whether the official misconduct

---

[6] Other cases have declined to reach the issue because it was unnecessary, not raised, or inadequately briefed. *State v. Smith*, 177 Wn.2d 533, 545 n.4, 303 P.3d 1047 (2013) (plurality opinion); *State v. Ibarra-Cisneros*, 172 Wn.2d 880, 885 n.2, 263 P.3d 591 (2011); *Armenta*, 134 Wn.2d at 10 n.7.

12

was flagrant and purposeful, and regardless of whether suppression is likely to deter similar misconduct in the future.

> 1. Washington courts apply a broad exclusionary rule based on independent state law

In order to determine whether and how the attenuation doctrine might apply to our state exclusionary rule, we must first explore the historical development, purposes, and scope of the exclusionary rule in Washington. Doing so reveals a long-standing commitment to an independent exclusionary rule that broadly protects the right to individual privacy.

The history of our state exclusionary rule starts with the federal exclusionary rule. The United States Supreme Court first indicated that federal courts should suppress illegally seized evidence in 1886, referring "to the use of the evidence there seized as 'unconstitutional.'" *Mapp v. Ohio*, 367 U.S. 643, 647, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961) (quoting *Boyd v. United States*, 116 U.S. 616, 638, 6 S. Ct. 524, 29 L. Ed. 746 (1886)). The federal exclusionary rule was further made explicit in the 1914 case of *Weeks v. United States*, which recognized that

> [i]f letters and private documents can thus be [illegally] seized and held and used in evidence against a citizen accused of an offense, the protection of the Fourth Amendment declaring his right to be secure against such searches and seizures is of no value, and, so far as those thus placed are concerned, might as well be stricken from the Constitution.

13

232 U.S. 383, 393, 34 S. Ct. 341, 58 L. Ed. 652 (1914). Denying a defendant's motion to suppress illegally seized evidence was thus "a denial of the constitutional rights of the accused" and could not be permitted. *Id.* at 398.

The federal exclusionary rule was first held applicable to the states in 1961. *Mapp*, 367 U.S. at 660. Washington, however, adopted an independent state exclusionary rule almost 40 years earlier, in 1922. *State v. Gibbons*, 118 Wash. 171, 189, 203 P. 390 (1922). The facts presented in *Gibbons* well illustrated the need for an exclusionary rule to protect individual rights. A county sheriff suspected the defendant possessed liquor, which was illegal at the time. The sheriff telephoned for a search warrant but, instead of waiting for a warrant to be issued, ordered the defendant to drive to the sheriff's office at gunpoint. On arrival at the sheriff's office, the sheriff removed a suitcase from the defendant's car and found several bottles of whiskey inside.

Easily concluding that the sheriff's actions were unconstitutional, we considered whether the whiskey could nevertheless be used as evidence in the defendant's trial for felony unlawful possession of intoxicating liquor. We held it could not because regardless of whether the federal exclusionary rule applied to the states, the Washington State Constitution's protections against unlawful searches and compelled self-incrimination required an exclusionary rule at least as robust as the federal rule. *Id.* at 184 (quoting WASH. CONST. art. I, §§ 7, 9).

Washington was in the minority of states when it adopted the exclusionary rule, as most states followed English common law and refused to suppress any relevant evidence, even if it was illegally obtained. *State v. Buckley*, 145 Wash. 87, 89, 258 P. 1030 (1927). Our minority position was subject to significant criticism. A prominent commentator asserted that states that had adopted the exclusionary rule were infected with a "'contagion of sentimentality'" resulting from the "'heretical influence of *Weeks v. United States*.'" *State v. Rousseau*, 40 Wn.2d 92, 98, 241 P.2d 447 (1952) (Finley, J., concurring in result) (quoting 8 JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 2184, at 31 (3d ed. 1940)). There were calls from within this court to either abandon the exclusionary rule or make "some reasonable modification or exception" on the basis that "it often and unreasonably may obstruct prosecution and confer immunity upon undeserving law violators." *Id.* at 99. However, this court consistently reaffirmed that "[i]t is the duty of courts to protect citizens from unwarranted, arbitrary, illegal arrests by officers of the law," and there could be "no doubt that the exclusionary doctrine of the *Weeks* case . . . is the law of this jurisdiction." *State v. Young*, 39 Wn.2d 910, 917, 239 P.2d 858 (1952); *State v. Smith*, 50 Wn.2d 408, 409, 314 P.2d 1024 (1957) (italics omitted).

Our exclusionary rule thus has its basis in independent state law. Nevertheless, for many years our state exclusionary rule was similar in scope to the

federal exclusionary rule. Sanford E. Pitler, Comment, *The Origin and Development of Washington's Independent Exclusionary Rule: Constitutional Right and Constitutionally Compelled Remedy*, 61 WASH. L. REV. 459, 486-87 (1986). This was so because when we first adopted the exclusionary rule, the federal rule was broadly protective, holding "in no uncertain language, that it is beneath the dignity of the state, and contrary to public policy, for the state to use for its own profit evidence that has been obtained in violation of law." *Buckley*, 145 Wash. at 89 (citing *Boyd*, 116 U.S. 616; *Weeks*, 232 U.S. 383; *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S. Ct. 182, 64 L. Ed. 319 (1920); *Gouled v. United States*, 255 U.S. 298, 41 S. Ct. 261, 65 L. Ed. 647 (1921); *Amos v. United States*, 255 U.S. 313, 41 S. Ct. 266, 65 L. Ed. 654 (1921); *Agnello v. United States*, 269 U.S. 20, 46 S. Ct. 4, 70 L. Ed. 145 (1925)). Because the federal exclusionary rule was so broad, there was no need for Washington to independently define the contours of its own exclusionary rule. Pitler, *supra*, at 487.

However, the federal exclusionary rule is no longer the broad doctrine it once was. Over time, federal courts have increasingly limited the exclusionary rule by narrowly focusing on the federal rule's purpose of deterring Fourth Amendment violations. This narrow focus has allowed for exceptions to the federal exclusionary rule in cases where suppression appears unlikely to deter

official misconduct in the future. Washington has repeatedly rejected calls to similarly narrow our own exclusionary rule.

Our first clear departure from federal law occurred when we held that the exclusionary rule applies to evidence discovered in a search incident to an arrest based on an unconstitutional stop-and-identify statute. *State v. White*, 97 Wn.2d 92, 109-10, 640 P.2d 1061 (1982).[7] The United States Supreme Court had recently reached the opposite conclusion, holding that "[n]o conceivable purpose of deterrence would be served by suppressing evidence" in such a case. *Michigan v. DeFillippo*, 443 U.S. 31, 38 n.3, 99 S. Ct. 2627, 61 L. Ed. 2d 343 (1979). We held that such a result "is justifiable only if one accepts the basic premise that the exclusionary rule is merely a remedial measure for Fourth Amendment violations." *White*, 97 Wn.2d at 109. We squarely rejected that premise as applied to article I, section 7 and reiterated that for our state exclusionary rule, "the emphasis is on protecting personal rights rather than on curbing governmental actions." *Id.* at 110. Suppression is an integral component of the right to privacy itself, and "whenever the right is unreasonably violated, the remedy must follow." *Id.*

---

[7] We have since clarified that *White*'s holding applies only to an arrest made pursuant to a statute that is "'so grossly and flagrantly unconstitutional by virtue of a prior dispositive judicial holding that it may not serve as the basis of a valid arrest.'" *State v. Brockob*, 159 Wn.2d 311, 341 n.19, 150 P.3d 59 (2006) (internal quotation marks omitted) (quoting *White*, 97 Wn.2d at 103). However, we have consistently adhered to *White*'s reasoning when considering whether to recognize a new exception to our state exclusionary rule. *Afana*, 169 Wn.2d at 180; *Winterstein*, 167 Wn.2d at 631-34.

We similarly declined to adopt the federal inevitable discovery doctrine, which "allows admission of illegally obtained evidence if the State can 'establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" *Winterstein*, 167 Wn.2d at 634 (quoting *Nix v. Williams*, 467 U.S. 431, 444, 104 S. Ct. 2501, 81 L. Ed. 2d 377 (1984)). This exception is based on the view that if evidence would have been discovered regardless of official misconduct, "then the deterrence rationale has so little basis that the evidence should be received." *Nix*, 467 U.S. at 444.

We rejected that view, again reiterating that a primarily deterrence-based rationale for the exclusionary rule "is at odds with the plain language of article I, section 7, which we have emphasized guarantees privacy rights with no express limitations." *Winterstein*, 167 Wn.2d at 635. Therefore, "balancing of interests should not be carried out when evidence is obtained in violation of a defendant's constitutional rights." *Id.* at 632. We concluded that the inevitable discovery doctrine cannot be compatible with article I, section 7 because "the inevitable discovery doctrine is necessarily speculative and does not disregard illegally obtained evidence." *Id.* at 634.

We also rejected the good faith exception, which provides that evidence will not be suppressed "when a search or seizure was unconstitutional but the police officer's belief that it was constitutional was objectively reasonable at the time."

18

*Afana*, 169 Wn.2d at 180. Federal courts recognize the good faith exception because "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144, 129 S. Ct. 695, 172 L. Ed. 2d 496 (2009).

Again, we reaffirmed that "[u]nlike its federal counterpart, Washington's exclusionary rule is 'nearly categorical.'" *Afana*, 169 Wn.2d at 180 (quoting *Winterstein*, 167 Wn.2d at 636). "In contrast to the Fourth Amendment, article I, section 7 emphasizes 'protecting personal rights rather than . . . curbing governmental actions.'" *Id.* (alteration in original) (quoting *White*, 97 Wn.2d at 110). Therefore, our state exclusionary rule does not allow any exception that "does not disregard illegally obtained evidence." *Id.* at 181. We also firmly rejected the State's "attempt[ ] to shift the reasonableness test built into the determination of probable cause to the question of whether the exclusionary rule is the appropriate remedy for a violation of a person's right of privacy under article I, section 7." *Id.* at 183. If evidence is illegally obtained then it must be suppressed, regardless of an officer's reasonable belief that his or her actions were lawful.

Thus, as our state law has developed independently over time, we have been extremely cautious about recognizing exceptions to the exclusionary rule, ensuring "'that the right of privacy shall not be diminished by the judicial gloss of a

selectively applied exclusionary remedy.'" *Winterstein*, 167 Wn.2d at 632 (quoting *White*, 97 Wn.2d at 110). Our state exclusionary rule requires the suppression of evidence obtained in violation of article I, section 7, with no exceptions that rely on speculation, the likelihood of deterrence, or the reasonableness of official misconduct.

2. Washington's exclusionary rule does not operate on a strict "but for" causation basis

Despite the broad application of our exclusionary rule, we have long recognized that the exclusionary rule applies only to the so-called "fruit of the poisonous tree," that is, evidence obtained as a direct or indirect result of an article I, section 7 violation. *State v. Rothenberger*, 73 Wn.2d 596, 600, 440 P.2d 184 (1968). We have also recognized that determining whether evidence actually is "fruit of the poisonous tree" cannot always be resolved by simply asking whether the evidence would have been discovered but for the official misconduct. For the exclusionary rule to apply, there must be some proximate causal connection between the misconduct and the evidence.

The need for a proximate causal connection is reflected in our cases applying the independent source doctrine, the only federally recognized exception to the exclusionary rule that we have expressly adopted. The independent source doctrine provides that "evidence tainted by unlawful governmental action is not subject to suppression under the exclusionary rule, provided that it ultimately is

obtained pursuant to a valid warrant or other lawful means independent of the unlawful action." *Gaines*, 154 Wn.2d at 718. This exception applies only where "the challenged evidence was discovered through a source independent from the initial illegality." *State v. Betancourth*, 190 Wn.2d 357, 365, 413 P.3d 566 (2018). The independent source doctrine is compatible with article I, section 7 because where it applies, the State derives no benefit from the misconduct of its officers. *Winterstein*, 167 Wn.2d at 634.

Some cases applying the independent source doctrine have held that even though official misconduct was arguably a "but for" cause of the discovery of evidence, the evidence was nevertheless admissible. For instance, in *Rothenberger*, the defendant was a passenger in a car that was allegedly unlawfully stopped by police. 73 Wn.2d at 597. The driver did not have a license, but Rothenberger did, so police allowed him to drive the car away. *Id.* Police later discovered an active warrant for Rothenberger's arrest on felony charges and transmitted that information to other officers, who ultimately stopped the car and arrested Rothenberger on the active felony warrant. *Id.* at 597-98. Rothenberger moved to suppress the evidence discovered following his arrest, arguing "that the officer who caused the information to be transmitted to the arresting officers, would not have acquired the information as to Rothenberger's identity had he not unlawfully stopped the Rothenberger car." *Id.* at 598.

21

We rejected this argument as "indescribably silly," noting that the active arrest warrant was an "independent source" and police "not only had the right but the duty to pursue Rothenberger and arrest him." *Id.* at 598-99. It was true that, but for the unlawful stop, police likely would not have arrested Rothenberger at the time they did because they would not have known where he was. However, the evidence discovered after his arrest was admissible because it was not "fruit of the poisonous tree" but, instead, the result of a lawful arrest pursuant to a valid warrant that provided the authority of law required by article I, section 7. *Id.* at 600.

Likewise, we recently held that evidence originally obtained pursuant to a defective warrant was admissible because a second, valid warrant was issued for the same evidence. *Betancourth*, 190 Wn.2d at 373. Arguably, the original defective warrant was a distant "but for" cause of discovering the evidence because the State did not seek the second warrant until it discovered the defect in the first one. *Id.* at 360-61. However the evidence itself was untainted because the second, valid warrant was a truly independent source. "[T]he illegal search [pursuant to the defective warrant] in no way contributed to the issuance of the [valid] warrant and police would have sought the warrant even absent the initial illegality." *Id.* at 365. Therefore, the State derived no benefit from the defective first warrant, and the evidence was admissible.

Our exclusionary rule cases thus make clear two basic principles of Washington law. First, our state exclusionary rule broadly protects the individual right to privacy and admits no exception that allows the State to benefit from violations of article I, section 7 by its officers, regardless of the officers' good faith or the likelihood that suppression will deter similar misconduct in the future. Second, our state exclusionary rule applies only to "fruit of the poisonous tree" and therefore does not operate on a strict "but for" causation basis. There must be some proximate causal connection between official misconduct and the discovery of evidence for the exclusionary rule to apply.

In the context of the attenuation doctrine, these two principles stand in tension with each other. On the one hand, a narrow attenuation doctrine could appropriately prevent our state exclusionary rule from operating on a "but for" basis. On the other hand, a broadly applied attenuation doctrine could improperly allow illegally obtained evidence to be admitted based on factors including the likelihood of deterrence and the purpose and flagrancy of official misconduct. And as discussed below, the federal attenuation doctrine has broadened significantly over time, making it difficult to determine whether and how to incorporate the attenuation doctrine into our independent state law.

3.  The federal attenuation doctrine has grown from a narrow exception requiring a superseding cause to a broad exception focused on deterrence

The attenuation doctrine was developed to address "the causal relationship between the unconstitutional act and the discovery of evidence." *Strieff*, 136 S. Ct. at 2061. At its inception, the attenuation doctrine ensured that "facts improperly obtained do not 'become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others.'" *Nardone v. United States*, 308 U.S. 338, 341, 60 S. Ct. 266, 84 L. Ed. 307 (1939) (quoting *Silverthorne Lumber Co.*, 251 U.S. at 392). While the independent source doctrine applies only where the evidence was obtained through a source completely independent of official misconduct, the attenuation doctrine was applied where "[s]ophisticated argument may prove a causal connection between" official misconduct and the discovery of evidence, but the connection was "so attenuated as to dissipate the taint." *Id.*

Historically, the attenuation doctrine required intervening circumstances that truly severed the chain of causation. "The notion of such a disrupting event comes from the tort law doctrine of proximate causation." *Strieff*, 136 S. Ct. at 2072 (Kagan, J., dissenting). In tort law, "[u]nforeseeable intervening acts break the chain of causation between 'the defendant's negligence and the plaintiff's injury.'" *Washburn v. City of Federal Way*, 178 Wn.2d 732, 761, 310 P.3d 1275 (2013)

24

(quoting *Schooley v. Pinch's Deli Mkt., Inc.*, 134 Wn.2d 468, 482, 951 P.2d 749 (1998)). This is generally known as "the doctrine of superseding cause." *Schooley*, 134 Wn.2d at 482.

The attenuation doctrine originally served the same function in the context of the exclusionary rule that the superseding cause doctrine serves in the context of tort law. Where unforeseeable intervening circumstances genuinely severed the chain of causation between official misconduct and the discovery of evidence, the intervening circumstances operated as a superseding cause. In such a case, the official misconduct was not a proximate cause of discovering the evidence, so the evidence was not "fruit of the poisonous tree." It was the "fruit" of the superseding cause. *See Strieff*, 136 S. Ct. at 2072-73 (Kagan, J., dissenting). Therefore, the attenuation doctrine applied, and the evidence could be admitted.

This historical version of the attenuation doctrine was most likely to be satisfied where the intervening circumstances at issue were unforeseeable acts of independent free will. For instance, in the seminal case of *Wong Sun*, the defendant was arrested without probable cause in violation of the Fourth Amendment. *Wong Sun v. United States*, 371 U.S. 471, 491, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). He had been "released on his own recognizance after a lawful arraignment, and had returned voluntarily several days later" to make a confession. *Id.* In concluding that the confession was admissible, the *Wong Sun*

25

Court recognized that not all evidence "is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." *Id.* at 488.

Therefore, instead of applying a strict "but for" causation standard, the question was whether the evidence was obtained "'by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Id.* (quoting JOHN MACARTHUR MAGUIRE, EVIDENCE OF GUILT: RESTRICTIONS UPON ITS DISCOVERY OR COMPULSORY DISCLOSURE 221 (1959)). The defendant's voluntary decision to return to the police and give his confession may not have occurred but for his unlawful arrest. Nevertheless, the defendant's decision was an intervening circumstance that truly severed the chain of causation. "In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, *Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.'" *Brown v. Illinois*, 422 U.S. 590, 602, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975) (quoting *Wong Sun*, 371 U.S. at 486).

The attenuation doctrine thus began as a narrow exception to the exclusionary rule requiring a superseding cause for the discovery of evidence. However, as federal courts have increasingly focused on the exclusionary rule's deterrent purpose, they have adopted new exceptions and expanded existing ones,

including the attenuation doctrine. The attenuation doctrine as applied by federal courts no longer asks only whether there was a superseding cause. Instead, "[t]he notion of the 'dissipation of the taint' attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." *Id.* at 609 (Powell, J., concurring in part).

As such, intervening circumstances are now sufficient to satisfy the federal attenuation doctrine if official misconduct is not the *sole* proximate cause of discovering evidence, even if the misconduct is still *one of several* proximate causes. This is illustrated by a recent decision of the United States Supreme Court holding that where an officer unlawfully seizes a person without reasonable suspicion, demands the person's identification, discovers an outstanding arrest warrant for an unpaid parking ticket, and discovers evidence in a search incident to arrest on that warrant, the federal attenuation doctrine is satisfied. *Strieff*, 136 S. Ct. at 2062-63. As Justice Sotomayor pointed out in dissent, "This case allows the police to stop you on the street, demand your identification, and check it for outstanding traffic warrants—even if you are doing nothing wrong." *Id.* at 2064. We have no authority to question this application of the federal exclusionary rule, but it clearly conflicts with our state exclusionary rule by admitting illegally seized

evidence and allowing the State to benefit from the unconstitutional actions of its officers. *Winterstein*, 167 Wn.2d at 634.

In addition, a "'particularly' significant" factor for courts applying the modern federal attenuation doctrine is "'the purpose and flagrancy of the official misconduct.'" *Strieff*, 136 S. Ct. at 2062 (quoting *Brown*, 422 U.S. at 604). This factor is directly related to the deterrence rationale underlying the federal attenuation doctrine and "reflects that rationale by favoring exclusion only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant." *Id.* at 2063. Where official misconduct is "at most negligent," the federal attenuation doctrine "strongly favors the State" and weighs heavily against suppression. *Id.* This factor is completely incompatible with our exclusionary rule's requirement to suppress all illegally seized evidence, regardless of whether officers acted reasonably, negligently, or intentionally. *Afana*, 169 Wn.2d at 184.

In sum, the attenuation doctrine has its origins in the tort law doctrine of superseding cause. The attenuation doctrine was once a narrow exception because in order to be a superseding cause, unforeseeable intervening circumstances must truly sever the causal connection between official misconduct and the discovery of evidence. However, the modern federal attenuation doctrine is not focused on whether the State can prove a break in the causal connection. Instead, the focus is on whether suppression in one case is likely to deter similar official misconduct in

28

the future and on whether the misconduct was so flagrant and purposeful that it warrants deterrence at all. This evolution in the federal attenuation doctrine has caused difficulties for Washington courts because while the narrow historical version of the federal attenuation doctrine may be compatible with article I, section 7, the broad modern version is not.

4. The attenuation doctrine is compatible with article I, section 7 so long as it is narrowly applied only where there is a true superseding cause for the discovery of evidence

In our most recent case concerning whether the attenuation doctrine is compatible with article I, section 7, we were essentially presented with two options: adopt the attenuation doctrine as currently applied by federal courts or reject the attenuation doctrine entirely and apply our exclusionary rule on a "but for" causation basis. *Eserjose*, 171 Wn.2d 907. As the lead and dissenting opinions pointed out, both options are problematic. We were therefore unable to reach a majority holding. Today, we reaffirm what was made clear by *Eserjose*, which is that neither wholesale adoption nor total rejection of the attenuation doctrine is appropriate as a matter of state constitutional law. Instead, we recognize a narrow, Washington-specific attenuation doctrine, to be applied only where the State proves that unforeseeable intervening circumstances truly severed the causal connection between official misconduct and the discovery of evidence.

We cannot reject the attenuation doctrine entirely because, as the historical discussion above makes clear, the lead opinion in *Eserjose* was correct in noting that "our cases do not stand for the proposition that the exclusionary rule under article I, section 7 operates on a 'but for' basis. Rather, we have consistently adhered to the 'fruit of the poisonous tree' doctrine." *Id.* at 919-20 (footnote omitted). We also agree with the lead opinion that on a practical level, "[a]n alternative 'but for' principle would make it virtually impossible to rehabilitate an investigation once misconduct has occurred, granting suspected criminals a permanent immunity unless, by chance, other law enforcement officers initiate an independent investigation." *Id.* at 922. The purpose of our state exclusionary rule is to protect individual privacy rights, not to permanently immunize suspects from investigation and prosecution.

Meanwhile, the dissent in *Eserjose* correctly highlighted the ways in which the broad, modern version of the federal attenuation doctrine is incompatible with article I, section 7. First, a broad attenuation doctrine not only fails to protect individual privacy but actually gives police "*less* incentive to obtain an arrest warrant if a station house confession is admissible despite an illegal arrest." *Id.* at 937 (C. Johnson, J., dissenting) (emphasis added). "Nor does such a doctrine respect our paramount concern of protecting individual privacy, as it would deny a remedy to those whose privacy has been unconstitutionally invaded. Additionally,

application of the exception would necessarily be speculative, a departure from our otherwise nearly categorical exclusionary rule." *Id.* at 940 (footnote omitted). Finally, the factors considered in the federal attenuation doctrine are "time, intervening circumstances, [and] less egregious misconduct," but it is not clear how these factors "can infuse the fruits of an illegal seizure with the authority of law required by article I, section 7." *Id.*

The concerns raised by the lead and dissenting opinions in *Eserjose* are all legitimate. We therefore do not wholly adopt or entirely reject the attenuation doctrine. Instead, we adopt a narrow, Washington-specific attenuation doctrine that ensures our exclusionary rule does not operate on a strict "but for" basis, but protects the individual right to privacy and prevents the State from benefiting from the unconstitutional actions of its officers. To do this, we look to the attenuation doctrine's historical origins, which, as discussed above, arose from the tort law doctrine of superseding cause.

To be held liable in tort, a defendant's actions must have proximately caused the plaintiff's injuries. Proximate causation is present where the defendant's action, "unbroken by any new independent cause produces the injury complained of." *Schooley*, 134 Wn.2d at 482. Correspondingly, "[w]hen an independent, intervening act of a third person is one which was not reasonably foreseeable then there is a break in the causal connection between the defendant's negligence and

31

the plaintiff's injury." *Id.* Where such an intervening act is present, it constitutes a superseding cause of the plaintiff's injury, and the defendant is not liable.

This formulation of a superseding cause is consistent with the attenuation doctrine as historically applied, for example in *Wong Sun*. As discussed above, the defendant's confession in *Wong Sun* was preceded by his unlawful arrest. However, the confession was actually obtained as the result of an unforeseeable intervening act—the defendant's decision to return to the police and give a confession days after he was released from custody. The defendant was not induced or urged to return and confess by the police, but chose to do so as a matter of independent free will. This decision acted as a superseding cause, allowing the confession to be admitted.

We have previously indicated that the *Wong Sun* version of the attenuation doctrine applies as a matter of state constitutional law. *E.g.*, *State v. O'Bremski*, 70 Wn.2d 425, 428, 423 P.2d 530 (1967). We now explicitly adopt a state attenuation doctrine that is satisfied if, and only if, an unforeseeable intervening act genuinely severs the causal connection between official misconduct and the discovery of evidence. If such a superseding cause is present, then the evidence is not properly viewed as "fruit of the poisonous tree" but, instead, as "fruit" of the superseding cause. In such a case, the State derives no benefit from its officers' unconstitutional actions. And because a superseding cause must, by definition, be

32

unforeseeable, this narrow attenuation doctrine will not encourage officials to violate article I, section 7 in the hopes of discovering evidence.

We caution that the attenuation doctrine we adopt today must be narrowly and carefully applied. The State bears the burden of proving that the attenuation doctrine applies and that evidence is admissible despite a violation of article I, section 7. *Armenta*, 134 Wn.2d at 14. To meet its burden, the State must prove that unforeseen intervening circumstances genuinely severed the causal connection between official misconduct and the discovery of evidence. The State cannot meet its burden by merely showing that there are one or more *additional* proximate causes of the discovery of evidence. The question of whether intervening circumstances constitute a superseding cause is a highly fact-specific inquiry that must account for the totality of the circumstances, just as it is in the context of tort law. *See Maltman v. Sauer*, 84 Wn.2d 975, 982, 530 P.2d 254 (1975).

We also caution that the narrow attenuation doctrine we adopt today is entirely independent of the modern attenuation doctrine used by federal courts. As such, it is irrelevant to our state attenuation doctrine whether suppression in one case will deter similar misconduct in the future. It is also irrelevant whether the officer's misconduct was merely negligent or was instead flagrant and purposeful. The only question is whether unforeseeable intervening actions genuinely severed the causal connection between official misconduct and the discovery of evidence.

33

If not, then the attenuation doctrine does not apply, and the evidence must be excluded in accordance with article I, section 7 and our state exclusionary rule.

C.     The Washington attenuation doctrine is not satisfied here

Although the trial court did not have the opportunity to rule on Mayfield's suppression motion in accordance with the narrow attenuation doctrine we adopt today, its findings of fact are sufficient for us to decide the issue as a matter of law. It is plain that the State cannot carry its burden of proving that the causal chain between the official misconduct and the discovery of evidence was genuinely severed by intervening circumstances in this case. We therefore hold that Mayfield's motion to suppress must be granted.

As related in the facts section above, Officer Nunes illegally seized Mayfield and requested consent to search his person and his truck while the illegal seizure was ongoing. The requests to search were certainly not unforeseeable intervening circumstances. As found by the trial court, these requests were a purposeful component of "a drug investigation that was not based upon any reasonable and articulable suspicion of actual criminal conduct." CP at 20.

Mayfield's consents to the two searches were also not independent acts of free will sufficient to establish a superseding cause. The State relies heavily on the fact that Mayfield was told he could refuse, limit, or revoke consent to the search of his truck, arguing that these *Ferrier* warnings made Mayfield's consent "an

34

informed decision" and thus "'an independent act of free will'" sufficient to satisfy the attenuation doctrine. Suppl. Br. of Resp't at 20. We cannot agree.

First, as the State acknowledges, Mayfield was not given full *Ferrier* warnings before consenting to the search of his person.[8] He was merely told he could refuse consent. We have previously considered an almost indistinguishable case applying the federal attenuation doctrine. In *Armenta*, the defendant was unlawfully seized, was asked for consent to search his car, and was told he could refuse. 134 Wn.2d at 6. He consented and the search yielded cocaine, which the trial court suppressed. *Id.* at 8-9. We affirmed the trial court.

First, we noted that although the defendant "freely and voluntarily consented to the search of his vehicle," it was a separate question "whether the prior illegal detention vitiated that consent." *Id.* at 16-17. We then concluded that it did, based on federal precedent holding that a "confession following issuance of *Miranda*[9] warnings [was] nevertheless tainted by illegal arrest and therefore inadmissible." *Id.* at 17 (citing *Brown*, 422 U.S. 590). Because we have already held that warning a person of the right to refuse consent is insufficient to satisfy the broad federal attenuation doctrine, we easily conclude that it is insufficient to satisfy our narrow

---

[8] *Ferrier* warnings are required only "where police request entry into a home for the purpose of obtaining consent to conduct a warrantless search." *State v. Khounvichai*, 149 Wn.2d 557, 563, 69 P.3d 862 (2003).

[9] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

state attenuation doctrine. And because Deputy Nunes asked to search Mayfield's truck based, in part, on the money he found when searching Mayfield's person, the two searches are directly causally linked.

Second, giving consent to search upon request during an unlawful seizure is very different from independently volunteering to be searched or giving a confession as an act of free will. Mayfield had no time to reflect on his options and was not free to leave. *Ferrier* warnings alone cannot change the fact that Mayfield's consent to search was the direct, foreseeable result of Officer Nunes's unconstitutional actions. Indeed, it would be unreasonable to expect a person to believe that he or she actually can refuse consent when the *Ferrier* warnings are given by the same officer who is currently subjecting the person to an ongoing unlawful seizure. A reasonable person might well believe that the officer would commit further constitutional violations, regardless of consent, so there would be no benefit to refusing. Therefore, consent to search during an ongoing unlawful seizure, even if preceded by *Ferrier* warnings, is entirely foreseeable and not an independent act of free will.[10] Such consent, without more, cannot be a superseding cause sufficient to satisfy the attenuation doctrine.

---

[10] Given the State's concession that Mayfield was illegally seized, we do not opine on the substantive adequacy of Mayfield's consent to the searches.

36

Finally, it is clear that if the state attenuation doctrine is satisfied solely by an unlawfully detained suspect's consent to search after *Ferrier* warnings, then the attenuation doctrine would not be a narrow exception to the exclusionary rule at all. To the contrary, it would be broadly applicable to any case where officials remember to use the appropriate "magic words" after violating a person's article I, section 7 rights. Such a broad rule would do little to protect individual privacy and would thus be inconsistent with article I, section 7 and our state exclusionary rule. It would also distort the purpose of *Ferrier*, which is to ensure that a person who has *not* been illegally seized can make an informed decision as to whether to consent to a search of his or her home. *Ferrier*, 136 Wn.2d at 118. *Ferrier* warnings were never designed to "purge the taint" of ongoing unlawful seizures for purposes of the attenuation doctrine.

It is clear from the trial court's findings that there were no intervening circumstances here that severed the causal connection between Mayfield's unlawful seizure and the discovery of the money and methamphetamine used against him at trial. Without such intervening circumstances, our state attenuation doctrine cannot apply. Therefore, the evidence must be suppressed.

## CONCLUSION

Although the attenuation doctrine is not categorically incompatible with article I, section 7, we hold that it must be an extremely narrow exception in order

to preserve the heightened protections of our state exclusionary rule. The attenuation doctrine can apply only where unforeseeable intervening circumstances genuinely sever the causal connection between official misconduct and the discovery of evidence. It is clear from the trial court's findings that there were no such unforeseeable intervening circumstances here. We therefore hold that Mayfield's motion to suppress must be granted, and we reverse and remand for further proceedings consistent with this opinion.

_Yu, J._

WE CONCUR:

_Fairhurst, C.J._

_Stephens, J._

_Madsen, J._

_Owens, J._

_González, J._

_Wiggins, J._

_Gordon McCloud, J._

No. 95632-4

JOHNSON, J. (concurring)—The issue presented in this case is whether the

federal attenuation doctrine is compatible with our state constitutional principles

recognized under article I, section 7 of the Washington Constitution. Our cases

interpreting article I, section 7 have rejected the federal good faith exception

doctrine and the federal inevitable discovery doctrine, and applying the same

reasoning, the federal attenuation doctrine should be rejected based on our state

constitution's stronger privacy protections and the narrower exceptions to

individual constitutional privacy protections.

Although the majority reaches the correct result, it errs in its reasoning. In

addressing the state constitutional issue, the majority correctly recognizes that a

*Gunwall*[1] factored argument is unnecessary. As correctly noted in the Court of

Appeals' dissent, "A *Gunwall* analysis is not required every time article I, section 7

---

[1] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986).

is applied in a new context. Instead, the court acknowledges that article I, section 7 generally is more protective and then engages in a conventional legal analysis to determine its scope and effect in the circumstances presented." *State v. Mayfield*, No. 48800-1-II, slip op. at 14 (Wash. Ct. App. Jan. 4, 2018) (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2048800-1-II%20Unpublished%20Opinion.pdf (Bjorgen, C.J., dissenting).

The United States Supreme Court established a closely related subset of exceptions to the exclusionary rule under the Fourth Amendment to the United States Constitution. Those include the good faith exception, the inevitable discovery doctrine, and the attenuation doctrine. Our cases analyzing article I, section 7 have addressed these exceptions.

In *State v. Afana*, 169 Wn.2d 169, 184, 233 P.3d 879 (2010), we rejected the federal good faith exception doctrine. In doing so, we recognized, "In contrast to the Fourth Amendment, article I, section 7 emphasizes 'protecting personal rights rather than . . . curbing governmental actions.'" *Afana*, 169 Wn.2d at 180 (alteration in original) (quoting *State v. White,* 97 Wn.2d 92, 110, 640 P.2d 1061 (1982)). Similarly, in *State v. Winterstein*, 167 Wn.2d 620, 636, 220 P.3d 1226 (2009), we rejected the federal inevitable discovery doctrine as "incompatible with the nearly categorical exclusionary rule under article I, section 7."

2

Important to the issue and facts represented here, in those cases and others

cited in those cases, the evidence was obtained contemporaneously with the

constitutional violation. In *Eserjose*, though three separate opinions were authored,

it appears no disagreement existed that if the confession had been

contemporaneously with the illegal seizure, suppression would be required. *State v.*

*Eserjose*, 171 Wn.2d 907, 927, 933 (Madsen, C.J., concurring), 936-37 (C.

Johnson, J., dissenting), 259 P.3d 172 (2011).

What these cases teach, and relevant to resolution of the issue here, is where

evidence is obtained contemporaneously with the constitutional privacy violation,

the attenuation doctrine does not apply and the evidence must be suppressed.

Importantly, we have largely rejected the attenuation doctrine under nearly

identical material facts in *State v. Rojo Armenta*, 134 Wn.2d 1, 948 P.2d 1280

(1997). *Armenta* involved, similar to the facts here, an illegal seizure of the

defendants and an otherwise voluntary consent to search a vehicle and its trunk

where evidence was found, after advising the defendant he could refuse to consent.

We reversed the conviction and held "consent, although voluntary, was tainted by

the prior illegal detention." *Armenta*, 134 Wn.2d at 17. In overturning the

conviction, we emphasized because the officer did not have "'specific and

articulable facts'" that defendants were engaged in criminal activity at the time of

3

the seizure and because the officer obtained consent "immediately after the detention and without the benefit of *Miranda*[2] warnings, [the consent] did not remove the taint of the prior illegal detention." *Armenta*, 134 Wn.2d at 17-18. Likewise, in the present case, the officer received John Mayfield's consent to search the truck immediately after what the State concedes was an illegal seizure.

Although *Armenta* purportedly relied on a Fourth Amendment analysis and not article I, section 7, that federal foundation seems somewhat shaky. However, its reasoning and language is consistent with our article I, section 7 cases, which should be expressly recognized. The federal attenuation doctrine should be rejected in circumstances where the evidence is obtained contemporaneously with the constitution violation. As amici point out, the attenuation doctrine "denies a remedy even as it concedes a constitutional violation." Br. of Amici Curiae[3] at 13. This is not consistent with our constitution's strong protection of privacy rights and our "nearly categorical" exclusionary rule. *Winterstein*, 167 Wn.2d at 636. We

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[3] Amici Curiae include the American Civil Liberties Union of Washington, Fred T. Korematsu Center for Law and Equality, Washington Association of Criminal Defense Lawyers, and Washington Defender Association.

4

should reject the attenuation doctrine.