# NOTICE:   SLIP OPINION
## (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JUNE 9, 2022

*González C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JUNE 9, 2022

*Erin L. Lennon*
ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 99730-6 |
| Respondent, | ) | |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| PALLA SUM, a/k/a PALLO SUM, a/k/a SAN KIM SUM, | ) ) | |
| | ) | Filed: June 9, 2022 |
| Petitioner. | ) | |
| | ) | |

YU, J. — This case concerns the analysis that courts must apply to determine whether a person has been seized by law enforcement for purposes of article I, section 7 of the Washington Constitution. It is well established that an encounter with law enforcement rises to the level of a seizure if "considering all the circumstances, an individual's freedom of movement is restrained and the individual would not believe [they are] free to leave or decline a request due to an officer's use of force or display of authority." *State v. Rankin*, 151 Wn.2d 689,

*State v. Sum*, No. 99730-6

695, 92 P.3d 202 (2004).  Today, we are asked whether "all the circumstances" of the encounter includes the race and ethnicity of the allegedly seized person.

As the parties correctly agree, the answer is yes.  Our precedent has always required that the seizure inquiry be made in light of the totality of the circumstances, and we have never stated that race and ethnicity cannot be relevant circumstances.  However, we have not explicitly held that in interactions with law enforcement, race and ethnicity matter.  We do so today.  Furthermore, to ensure that all the circumstances of a law enforcement encounter are properly considered, including race and ethnicity, we take this opportunity to clarify the seizure inquiry as a matter of independent state law, taking guidance from GR 37.

As set forth in this court's precedent, the seizure inquiry is an objective test in which the allegedly seized person has the burden to show that a seizure occurred.  To aid courts in the application of this test, we now clarify that a person is seized for purposes of article I, section 7 if, based on the totality of the circumstances, an objective observer could conclude that the person was not free to leave, to refuse a request, or to otherwise terminate the encounter due to law enforcement's display of authority or use of physical force.  For purposes of this analysis, an objective observer is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in disproportionate police contacts, investigative seizures, and uses of force against Black, Indigenous,

2

*State v. Sum*, No. 99730-6

and other People of Color (BIPOC) in Washington. Finally, in accordance with our precedent, if the person shows there was a seizure, then the burden shifts to the State to prove that the seizure was lawfully justified by a warrant or an applicable exception to the warrant requirement.

Based on the totality of the circumstances presented in this case, we hold that petitioner Palla Sum was seized when a sheriff's deputy requested Sum's identification while implying that Sum was under investigation for car theft. As the State properly concedes, at that time, the deputy did not have a warrant, reasonable suspicion, or any other lawful authority to seize Sum. As a result, Sum was unlawfully seized, and the false name and birth date he gave to the deputy must be suppressed. We therefore reverse the Court of Appeals and remand to the trial court for further proceedings.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

A.    Factual background

On April 9, 2019, Pierce County Sheriff's Deputy Mark Rickerson was on patrol, driving an unmarked police vehicle through an area where there were "some problem houses" that Deputy Rickerson liked to "keep an eye on." 1 Verbatim Report of Proceedings (VRP) (Aug. 6, 2019) at 10. At 9:15 a.m., the deputy noticed a Honda Civic parked near the entry gate to a church parking lot.

3

The Honda was not blocking the entry gate, and there is no indication that it was parked illegally. Nevertheless, the car attracted the deputy's attention because "it was parked there." *Id.* at 17. The location was significant to Deputy Rickerson because "four or five months before . . . another deputy in [his] unit arrested another subject there in a stolen vehicle." *Id.* at 13. Within that same four- to five-month time frame, an unnamed person approached Deputy Rickerson in a nearby grocery store parking lot to tell the deputy that they were "concerned about all the vehicles that were parking there that didn't belong in the area." *Id.*

As Deputy Rickerson observed the Honda, he saw Sum, who "was slumped over and appeared to be unconscious in the driver's seat." Suppl. Clerk's Papers (CP) at 86. At that point, the deputy decided to conduct "a social contact" and parked nearby, "making sure to leave enough room so as not to block the Honda Civic or prevent it from leaving." 1 VRP (Aug. 6, 2019) at 20; Suppl. CP at 86. Before getting out of his police vehicle, Deputy Rickerson conducted a records check of the Honda's license plate and discovered a report of sale, although it was not clear when the sale had occurred. The records check also showed that the car had not been reported stolen, but the records did not state the name of the current owner. Deputy Rickerson noted the last four digits of the Vehicle Identification Number (VIN) associated with the Honda's license plate, then approached the driver's side of the car on foot, wearing his full uniform.

*State v. Sum*, No. 99730-6

As he approached, Deputy Rickerson noticed another man in the car, who was in the front passenger seat. Both Sum and the passenger "appeared to be unconscious and did not notice Rickerson approach." Suppl. CP at 86. Before attempting to wake them, Deputy Rickerson checked the Honda's public VIN to confirm that it matched the license plates. The deputy then knocked on the driver's side window. After "seven to eight seconds," Sum "slowly woke up" and "rolled the window down slightly." 1 VRP (Aug. 6, 2019) at 22-23.

Deputy Rickerson asked Sum what he and his passenger were doing there, and Sum responded that they "were waiting for a friend." *Id.* at 23. The deputy then asked Sum who owned the Honda. Sum said the Honda was not his, and he identified the owner "with the given name, but not the surname, of an individual." Suppl. CP at 86. At the suppression hearing, Deputy Rickerson could not recall the name Sum provided.

Deputy Rickerson next asked Sum and his passenger for identification, and Sum "asked him why he wanted it." *Id.* The deputy responded "that the two men were sitting in an area known for stolen vehicles and that [Sum] did not appear to know to whom the vehicle he was sitting in belonged." *Id.* at 87. Sum provided a false name and date of birth. The passenger gave his true name and birth date.

Deputy Rickerson walked back to his patrol vehicle to check the names Sum and his passenger provided. While the deputy was in his vehicle, Sum started the

5

*State v. Sum*, No. 99730-6

Honda's engine, "backed up quickly, and then took off," driving partially on the sidewalk and over some grass. 1 VRP (Aug. 6, 2019) at 29. Deputy Rickerson activated his emergency lights and started pursuing the Honda, soon joined by another deputy in a separate vehicle. Sum drove at a high rate of speed through a stop sign and multiple red lights before ultimately crashing in someone's front yard. Deputy Rickerson handcuffed Sum and read him the *Miranda*[1] warnings.

A search of Sum's person incident to arrest turned up the Honda's title and registration, which showed that the car did, in fact, belong to Palla Sum. He had purchased it two weeks earlier. The search of Sum's person also uncovered a small holster in his pants, and when the Honda was later searched pursuant to a warrant, police discovered a pistol.

B.     Procedural history

Sum was charged by amended information with unlawful possession of a firearm in the first degree, attempting to elude a pursuing police vehicle, and making a false or misleading statement to a public servant. *See* RCW 9.41.040(1)(a); RCW 46.61.024(1); RCW 9A.76.175. The original and amended charging documents both specify that Sum's race is "ASIAN/PACIFIC ISLAND[ER]." CP at 4, 23.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

*State v. Sum*, No. 99730-6

Sum filed a pretrial motion to suppress pursuant to CrR 3.6, contending that he was unlawfully seized without reasonable suspicion when Deputy Rickerson requested Sum's identification while implying that Sum was under investigation for car theft. The court denied Sum's motion to suppress, ruling that "[b]ecause Rickerson did not retain [Sum]'s physical identification to conduct his records check, [Sum] was not seized when Rickerson asked him to identify himself." Suppl. CP at 89. Sum was convicted of all three charges by a jury. Like the charging documents, Sum's felony judgment and sentence states that his race is "Asian/Pacific Islander." CP at 65. His ethnicity is listed as "Non-Hispanic." *Id.*

Sum appealed, and the Court of Appeals affirmed in an unpublished opinion, holding that Sum was not seized by the deputy's request for identification because "merely asking for identification is properly characterized as a social contact." *State v. Sum*, No. 53924-1-II, slip op. at 8 (Wash. Ct. App. Apr. 13, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2053924-1-II%20Unpublished%20Opinion.pdf. Sum petitioned for review, reiterating his previous arguments and further contending for the first time that "there is no justification—aside from unacceptably ignoring the issue of race altogether—for courts considering the totality of the circumstances to disregard the effect of race as one of the circumstances affecting evaluation of police contact." Pet. for Review at 15.

7

*State v. Sum*, No. 99730-6

We granted Sum's petition for review and accepted for filing a joint amici brief by the King County Department of Public Defense, the American Civil Liberties Union of Washington, the Fred T. Korematsu Center for Law and Equality, and the Washington Defender Association. We now reverse.

ISSUE

When did Sum's interaction with Deputy Rickerson rise to the level of a warrantless seizure?

ANALYSIS

Where a person moves to suppress evidence on the basis that they were unlawfully seized, "we must first determine whether a warrantless search or seizure has taken place and, if it has, whether the action was justified by an exception to the warrant requirement." *Rankin*, 151 Wn.2d at 695. Here, the State concedes that there was no lawful justification to seize Sum "until he drove off at a high rate of speed, over grass and the sidewalk." Answer to Pet. for Review at 18; *see also* Wash. Supreme Court oral argument, *State v. Sum*, No. 99730-6 (Mar. 8, 2022), at 18 min., 25 sec., *video recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org. As a result, this case concerns only the first

8

*State v. Sum*, No. 99730-6

step of the seizure analysis: when, precisely, Sum was seized by Deputy Rickerson

for purposes of article I, section 7.[2]

"[A] seizure occurs, under article I, section 7, when considering all the

circumstances, an individual's freedom of movement is restrained and the

individual would not believe [they are] free to leave or decline a request due to an

officer's use of force or display of authority." *Rankin*, 151 Wn.2d at 695. "This

determination is made by objectively looking at the actions of the law enforcement

officer." *Id.* Thus, it is irrelevant that Sum drove away when Deputy Rickerson

went back to his patrol vehicle to check Sum's identity. *See State v. Young*, 135

Wn.2d 498, 509-10, 957 P.2d 681 (1998). *Contra California v. Hodari D.*, 499

U.S. 621, 626, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991). In addition, the

"subjective intent of police is irrelevant to the question [of] whether a seizure

occurred unless it is conveyed to the defendant." *State v. O'Neill*, 148 Wn.2d 564,

575, 62 P.3d 489 (2003) (citing *State v. Knox*, 86 Wn. App. 831, 839, 939 P.2d 710

(1997), *overruled on other grounds by O'Neill*, 148 Wn.2d at 571).

---

[2] Because "'[i]t is well settled that article I, section 7 of the Washington Constitution provides greater protection to individual privacy rights than the Fourth Amendment to the United States Constitution,'" we consider the issue presented in this case as a matter of independent state law, and "we need not engage in an analysis under *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986)." *Rankin*, 151 Wn.2d at 694 (quoting *State v. Jones*, 146 Wn.2d 328, 332, 45 P.3d 1062 (2002)).

9

*State v. Sum*, No. 99730-6

Sum has the burden to show that he was seized. *Id.* at 574. The trial court's unchallenged findings "are verities on appeal."[3] *Id.* at 571. Whether the facts establish an article I, section 7 violation "is a question of law, which is reviewed de novo." *Rankin*, 151 Wn.2d at 694.

Sum does not challenge the trial court's ruling that Deputy Rickerson's "initial contact" with Sum was "a reasonable check on health and safety." Suppl. CP at 88. It is also undisputed that at some point, the interaction between Sum and Deputy Rickerson rose to the level of a warrantless seizure. Therefore, the issue that we must decide is when the seizure occurred. In deciding this issue, Sum also asks us to address a threshold question: Is his race[4] relevant to our analysis?

A.    We choose to reach the threshold question raised by Sum's petition

As noted above, the article I, section 7 seizure inquiry requires consideration of "all the circumstances" of the interaction between law enforcement and the allegedly seized person. *Rankin*, 151 Wn.2d at 695; *see also O'Neill*, 148 Wn.2d at 574; *Young*, 135 Wn.2d at 510; *State v. Thorn*, 129 Wn.2d 347, 352, 917 P.2d 108 (1996), *overruled on other grounds by O'Neill*, 148 Wn.2d at 571. We have never held that the race and ethnicity of the allegedly seized person are not relevant

_____

[3] Sum challenges one of the trial court's findings of fact. However, that finding is relevant only to whether Deputy Rickerson had reasonable suspicion when he requested Sum's identification. Because the State correctly concedes that the deputy did not have reasonable suspicion at that time, we do not consider the challenged finding on review.

[4] Sum does not contend that his ethnicity is relevant in this case.

10

*State v. Sum*, No. 99730-6

circumstances.  Nevertheless, our precedent has conspicuously failed to acknowledge the impact of race and ethnicity on police encounters.  Sum asks that we do so today.

The State, however, argues that we should decline to answer this threshold question because "the issue of race" was "raised for the first time in Sum's petition for review."  Suppl. Br. of Resp't at 10 (capitalization and boldface omitted).  We disagree.  Sum's race is not an "issue" but an undisputed fact, which is clearly stated multiple times in the record.  CP at 4, 23, 65.  The "issue" in this case is when Sum was seized by Deputy Rickerson in light of all the circumstances surrounding their interaction.

The State also contends that we should not decide whether race and ethnicity are relevant to the seizure inquiry because "Sum himself concedes that resolution of the issue is not necessary in his case."  Suppl. Br. of Resp't at 10.  This mischaracterizes Sum's position, which is that consideration of Sum's race "is not necessary for him to *prevail* in this case."  Pet. for Review at 15 (emphasis added).  Thus, perhaps Sum would concede that we need not consider his race, if the State would concede Sum was seized when Deputy Rickerson requested Sum's identification.  The State makes no such concession.

It would be unjust to dodge the threshold question that was clearly presented in Sum's petition.  We granted review without limitation, and the question has now

11

*State v. Sum*, No. 99730-6

been thoroughly briefed by the parties and amici. It is long past time for this court to explicitly determine whether the race and ethnicity of an allegedly seized person are relevant to the determination of whether a seizure occurred.

B.    Race and ethnicity are relevant circumstances in the seizure analysis, both in general and in this case

Having decided to reach the threshold question presented by Sum's petition, we must now determine the answer. The State concedes that "consideration of relevant, objective demographic factors would be consistent with this Court's recognition of the flexible nature of the [seizure] test." Suppl. Br. of Resp't at 18. We agree, and we hold that an allegedly seized person's race and ethnicity are relevant to the question of whether they were seized by law enforcement for purposes of article I, section 7. Nevertheless, the State contends that *Sum's* race is not relevant in *this* case. We see no reason to treat Sum's case as an exception to the general rule we announce today. We therefore hold that Sum's race is one of many relevant circumstances that must be considered in determining when he was seized by Deputy Rickerson.

1.    A person's race and ethnicity are relevant to the question of whether they have been seized by law enforcement

As noted above, the State concedes that the article I, section 7 test for determining when a person has been seized should include consideration of the person's race and ethnicity. Nevertheless, we are not bound by a party's

12

concession on a point of law, so we conduct an independent state law analysis to demonstrate why the State's concession is correct. *State v. Bacon*, 190 Wn.2d 458, 463 n.4, 415 P.3d 207 (2018).

In the article I, section 7 context, we need not apply the *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986), factors to engage in an independent state law analysis, but we must still determine "'whether the unique characteristics of the state constitutional provision and its prior interpretations actually compel a particular result.'" *State v. Mayfield*, 192 Wn.2d 871, 879, 434 P.3d 58 (2019) (internal quotation marks omitted) (quoting *State v. Chenoweth*, 160 Wn.2d 454, 463, 158 P.3d 595 (2007)). To do so, we examine (1) "'the constitutional text,'" (2) "'the historical treatment of the interest at stake as reflected in relevant case law and statutes,'" and (3) "'the current implications of recognizing or not recognizing an interest.'" *Id.* at 879-80 (quoting *Chenoweth*, 160 Wn.2d at 463). These factors show that race and ethnicity are relevant to the determination of whether a person was seized for purposes of article I, section 7.

First, the constitutional text is straightforward because, as has been repeatedly recognized in our cases, the plain language of article I, section 7 "'guarantees privacy rights with no express limitations.'" *Id.* at 887 (quoting *State v. Winterstein*, 167 Wn.2d 620, 635, 220 P.3d 1226 (2009)). Nothing in the text of

13

*State v. Sum*, No. 99730-6

the constitution indicates that the totality of the circumstances of an alleged seizure should be artificially limited to exclude race or ethnicity.

Second, the historical treatment of the interest at stake in this case shows an evolutionary process. Historically, many of this court's opinions concerning the civil rights and lived experiences of BIPOC have been deplorable. *See, e.g.*, *Price v. Evergreen Cemetery Co. of Seattle*, 57 Wn.2d 352, 357 P.2d 702 (1960), *overruled by Garfield County Transp. Auth. v. State*, 196 Wn.2d 378, 473 P.3d 1205 (2020); *State v. Towessnute*, 89 Wash. 478, 154 P. 805 (1916), *repudiated by* 197 Wn.2d 574, 486 P.3d 111 (2020); *In re Application of Takuji Yamashita*, 30 Wash. 234, 70 P. 482 (1902), *disapproved*, 143 Wn.2d xxxiii-lix (2001).

However, history is not a static factor in our analysis. Every decision of this court makes new history, in which we are "constantly striving for better." Letter from Wash. State Supreme Court to Members of Judiciary & Legal Cmty. at 2 (Wash. June 4, 2020), https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20News/Judiciary%20Legal%20Community%20SIGNED%20060420.pdf [https://perma.cc/QNT4-H5P7]. Our recent history has made notable strides toward recognizing and rejecting racial injustices. In addition to disavowing the blatantly racist precedent above, we have created new standards and modified old ones, particularly in the criminal justice arena.

14

*State v. Sum*, No. 99730-6

For instance, we singled out racially biased prosecutorial misconduct for heightened scrutiny on appeal because "[t]he gravity of the violation of article I, section 22 and Sixth Amendment principles by a prosecutor's intentional appeals to racial prejudices cannot be minimized or easily rationalized as harmless." *State v. Monday*, 171 Wn.2d 667, 680, 257 P.3d 551 (2011). We also eliminated capital punishment when empirical evidence made it "apparent that Washington's death penalty is administered in an arbitrary and racially biased manner." *State v. Gregory*, 192 Wn.2d 1, 18-19, 427 P.3d 621 (2018) (plurality opinion).

Moreover, in adopting GR 37, we rejected *Batson*'s[5] focus on purposeful discrimination in the exercise of peremptory challenges and, instead, shifted the inquiry to whether "an objective observer could view race or ethnicity as a factor in the use of the peremptory challenge." GR 37(e); *see also State v. Jefferson*, 192 Wn.2d 225, 249-50, 429 P.3d 467 (2018) (plurality opinion). We have also borrowed from the GR 37 framework to guide our analysis of whether "implicit racial bias was a factor in [a] jury's verdict," recognizing that "racial bias is a common and pervasive evil that causes systemic harm to the administration of justice." *State v. Berhe*, 193 Wn.2d 647, 665, 657, 444 P.3d 1172 (2019). Thus, there was a time when the historical treatment of BIPOC in this court indicated that

---

[5] *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

15

*State v. Sum*, No. 99730-6

we should ignore the influence of race and ethnicity in police encounters. However, in light of more recent history, such a result can no longer be justified.

In the third and final factor of our independent state law analysis, we must consider the current implications of recognizing (or failing to recognize) that race and ethnicity are relevant to the seizure analysis. *Mayfield*, 192 Wn.2d at 879-80. This factor clearly favors recognition. It would be nonsensical to hold that a person's race and ethnicity, though clearly relevant to the important trial rights discussed above, are irrelevant to the question of how the person was brought into the criminal justice system in the first place. Moreover, recognizing the relevance of race and ethnicity is not an outlier position, and it does not undermine the objective nature of the seizure inquiry.

Several courts applying the Fourth Amendment to the United States Constitution, which is less protective than article I, section 7, have already recognized that the race of an allegedly seized person "is 'not irrelevant' to the question of whether a seizure occurred." *United States v. Smith*, 794 F.3d 681, 688 (7th Cir. 2015) (quoting *United States v. Mendenhall*, 446 U.S. 544, 558, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980)); *see also Dozier v. United States*, 220 A.3d 933, 942-45 (D.C. 2019); *United States v. Washington*, 490 F.3d 765, 773 (9th Cir. 2007). Moreover, when considering analogous issues relating to police encounters, the United States Supreme Court has held that objective demographic factors, such

16

*State v. Sum*, No. 99730-6

as a defendant's race and age, are relevant considerations. *Mendenhall*, 446 U.S. at 558 (age and race are relevant to whether a police encounter was consensual); *see also J.D.B. v. North Carolina*, 564 U.S. 261, 265, 131 S. Ct. 2394, 180 L. Ed. 2d 310 (2011) (age is relevant to whether a minor was in custody for *Miranda* purposes). At least one other state has also recognized "that race is one circumstance that courts may consider in conducting the totality of the circumstances seizure analysis" as a matter of independent state law. *State v. Jones*, 172 N.H. 774, 775, 235 A.3d 119 (2020).

By contrast, courts that have rejected any consideration of race or ethnicity in the seizure analysis have done so based on misplaced concerns about what such an analysis would involve. For instance, the Tenth Circuit Court of Appeals held that any consideration of race would impermissibly transform the seizure inquiry into a subjective one, based on the observation that "[t]here is no uniform life experience for persons of color, and there are surely divergent attitudes toward law enforcement officers among members of the population." *United States v. Easley*, 911 F.3d 1074, 1082 (10th Cir. 2018); *see also United States v. Knights*, 989 F.3d 1281, 1288-89 (11th Cir.), *cert. denied*, 142 S. Ct. 709 (2021). While this observation is true, it is not informative to the question presented.

Regardless of whether race and ethnicity are considered, the seizure analysis is *not* based on the subjective viewpoint of the allegedly seized individual, with

17

*State v. Sum*, No. 99730-6

their unique "life experience" or "attitudes." *Contra Easley*, 911 F.3d at 1082.

Instead, the seizure analysis in Washington is "'a purely *objective* one, looking to

the actions of the law enforcement officer.'" *O'Neill*, 148 Wn.2d at 574 (quoting

*Young*, 135 Wn.2d at 501). And an objective observer in Washington "is aware

that implicit, institutional, and unconscious biases, in addition to purposeful

discrimination, have resulted in" many injustices against BIPOC, particularly in

the criminal justice system. GR 37(f); *see also Berhe*, 193 Wn.2d at 665.

Thus, the State's concession is correct. Based on the constitutional text,

recent developments in this court's historical treatment of the rights of BIPOC, and

the current implications of our decision, we hold as a matter of independent state

law that race and ethnicity are relevant to the question of whether a person was

seized by law enforcement. We express no opinion as to whether race and

ethnicity might be relevant in determining whether a particular warrantless seizure

was justified by reasonable suspicion or some other exception to the warrant

requirement, as that issue is not before us.

2.     Sum's race is a relevant circumstance in this case

Although the State concedes that race and ethnicity can be relevant in some

cases, it contends that Sum's race is irrelevant in this case because (1) Sum did not

produce evidence showing that police in Pierce County in 2019 were likely to

commit acts of discrimination and violence against members of the Asian/Pacific

18

*State v. Sum*, No. 99730-6

Islander community[6] and (2) the record does not explicitly show that Deputy

Rickerson's words or actions were influenced by Sum's race. We disagree. The

State's proposed analysis places an unjustifiably high burden on the allegedly

seized person and suggests an improper, subjective inquiry based on the privately

held motivations of law enforcement officers.

First, the State contrasts Sum's case with other seizure cases that considered

media reports and statistics showing recent discrimination by local police against

individuals of the defendant's race. Suppl. Br. of Resp't at 13-15 (discussing

*Washington*, 490 F.3d at 767-68, 772-74; *Dozier*, 220 A.3d at 941-45). The State

contends that Sum's race is irrelevant to our seizure analysis because there is no

similar evidence in the record here. *See id.* at 23 (citing *State v. Spears*, 429 S.C.

422, 444, 839 S.E.2d 450, *cert. denied*, 141 S. Ct. 859 (2020)). We decline the

State's invitation to presume that race and ethnicity are irrelevant unless proved

otherwise. Statistical evidence and media reports may increase the weight that

should be given to race or ethnicity in a particular seizure analysis, but the lack of

such evidence does not make a person's race or ethnicity irrelevant.

When it comes to police encounters without reasonable suspicion, "it is no

secret that people of color are disproportionate victims of this type of scrutiny."

---

[6] As discussed further below, we recognize that the aggregated category of "Asian/Pacific Islander" often masks important distinctions between the many diverse groups that fall within it. We use the aggregated category here based on the evidence and language in the record.

*Utah v. Strieff*, 579 U.S. 232, 254, 136 S. Ct. 2056, 195 L. Ed. 2d 400 (2016) (Sotomayor, J., dissenting).  Indeed, our own GR 37 recognizes the disproportionate police contacts experienced by BIPOC and provides that factors such as "having prior contact with law enforcement officers"; "expressing a distrust of law enforcement or a belief that law enforcement officers engage in racial profiling"; "having a close relationship with people who have been stopped, arrested, or convicted of a crime"; and "living in a high-crime neighborhood" are all "presumptively invalid reasons for a peremptory challenge."  GR 37(h)(i)-(iv).  All such factors have historically "been associated with improper discrimination in jury selection."  *Id.* at (h).

As a result, the relevance of race and ethnicity in the seizure inquiry cannot turn on whether there has been recent, well-publicized discrimination and violence by law enforcement directed at individuals of the same race or ethnicity as the allegedly seized person.  Instead, we must be cognizant that

> [f]or generations, black and brown parents have given their children "the talk"—instructing them never to run down the street; always keep your hands where they can be seen; do not even think of talking back to a stranger—all out of fear of how an officer with a gun will react to them.

*Strieff*, 579 U.S. at 254 (Sotomayor, J., dissenting).  Simply put, a person's race or ethnicity does not become relevant with media reports of targeted police

20

*State v. Sum*, No. 99730-6

discrimination or violence, nor does it become irrelevant in the temporary absence of such reports.

Similarly, requiring an allegedly seized person to produce statistics showing precisely how their race and ethnicity should be factored into the seizure analysis would artificially raise their burden, while unjustly ignoring the "pain, suffering, and distrust that statistics fail to capture." TASK FORCE 2.0: RACE AND CRIMINAL JUSTICE SYS., RACE AND WASHINGTON'S CRIMINAL JUSTICE SYSTEM: 2021 REPORT TO THE WASHINGTON SUPREME COURT 6 (2021), https://digitalcommons.law.seattleu.edu/korematsu_center/116. Statistics, like media reports, may add weight to the impact of race or ethnicity in particular cases. *See Dozier,* 220 A.3d at 944 nn.13-16. However, a lack of statistics cannot totally negate the relevance of a person's race or ethnicity because statistical data are inherently limited by the manner and means in which they are collected.

Some statistical limitations are particularly relevant to Sum's case. For instance, "[a]t times, 'Asian' is used by reporting agencies or groups as an umbrella designation that includes Native Hawaiians and other Pacific Islanders." RACE AND WASHINGTON'S CRIMINAL JUSTICE SYSTEM, *supra*, at x. Therefore, while some aggregated data show that "Asians" are less likely to be subjected to police force, "individuals who are Native Hawaiians and Other Pacific Islanders are 3.3 times more likely than a White person to be killed by police." *Id.* at 3.

21

*State v. Sum*, No. 99730-6

Statistics also may fail to include non-English-speakers, resulting in data that "may not be representative of the overall U.S. Asian population." JULIANA MENASCE HOROWITZ, ANNA BROWN & KIANA COX, PEW RES. CTR., RACE IN AMERICA 2019 at 16 (Apr. 9, 2019), https://www.pewresearch.org/social-trends/wp-content/uploads/sites/3/2019/04/Race-report_updated-4.29.19.pdf [https://perma.cc/MK2M-MH8P].

Thus, holding that a person's race and ethnicity are irrelevant unless the person produces statistics showing a pattern of targeted police discrimination or violence would reinforce the same systemic inequalities that prevent such statistics from being reliably compiled in the first instance. History has shown that when courts create "'crippling'" legal burdens to recognizing the constitutional rights of BIPOC, their lived experiences are unjustly disregarded and their rights go unprotected. *Jefferson*, 192 Wn.2d at 240 (Gordon McCloud, J., lead opinion) (quoting *Batson*, 476 U.S. at 92). We decline the invitation to impose such burdens here.

Finally, the State argues that we cannot consider Sum's race in determining when he was seized because the record "is silent as to Deputy Rickerson's race" or "any relevant racial circumstances surrounding the encounter." Suppl. Br. of Resp't at 24. Like the news reports and statistics discussed above, Deputy Rickerson's race might be relevant if known. However, the fact that we do not

22

*State v. Sum*, No. 99730-6

know the deputy's race does not negate the relevance of Sum's race, which is clearly established by the record and undisputed on appeal. To the extent the State argues Sum must prove that his race had an explicit influence on Deputy Rickerson's intentions or conduct, it is incorrect.

As discussed above, the "subjective intent of police is irrelevant to the question [of] whether a seizure occurred unless it is conveyed to the defendant." *O'Neill*, 148 Wn.2d at 575. *Contra State v. Johnson*, 8 Wn. App. 2d 728, 745 n.5, 440 P.3d 1032 (2019) (improperly declining to consider race in the seizure analysis because "the officers had no idea as to Johnson's race when they made the decision to initiate the encounter"). Of course, if an officer informs a person that they were contacted based on their race or ethnicity, that fact would increase the weight that should be given to the person's race or ethnicity in the seizure analysis. However, the absence of such an overt statement does not mean that race and ethnicity are irrelevant. As this court has repeatedly recognized, "many who consciously hold racially biased views are unlikely to admit to doing so" and "implicit racial bias exists at the unconscious level, where it can influence our decisions without our awareness." *Berhe*, 193 Wn.2d at 657; *see also State v. Saintcalle*, 178 Wn.2d 34, 46-49, 309 P.3d 326 (2013) (plurality opinion), *abrogated on other grounds by City of Seattle v. Erickson*, 188 Wn.2d 721, 398 P.3d 1124 (2017). There is no

23

*State v. Sum*, No. 99730-6

reason to assume that law enforcement officers are immune from holding and being affected by unexpressed racial and ethnic biases.

In sum, while it is true that there is no uniform life experience or perspective shared by all people of color, heightened police scrutiny of the BIPOC community is certainly common enough to establish that race and ethnicity have at least some relevance to the question of whether a person was seized. *Cf. J.D.B.*, 564 U.S. at 272 (considering the age of an allegedly detained minor in light of "conclusions [that] apply broadly to children as a class"). The weight that should be given to the allegedly seized person's race and ethnicity will vary between cases based on the evidence presented, but the State cites no Washington authority holding that any objective circumstance is presumptively irrelevant to the seizure inquiry. The suggestion that we should do so with respect to race and ethnicity invites us to draw "a strained and incorrect" distinction between race and ethnicity and all other circumstances, which we decline to do. *Garfield Transp. Auth.*, 196 Wn.2d at 391 n.1. Therefore, we hold that Sum's race is relevant to our determination of when he was seized by Deputy Rickerson.

C.    To account for all the circumstances of a law enforcement encounter, including the allegedly seized person's race and ethnicity, we take guidance from GR 37

As discussed above, the parties correctly agree that race and ethnicity can be relevant to the seizure inquiry, and we further hold that Sum's race is relevant to

24

*State v. Sum*, No. 99730-6

the seizure inquiry in this case. Although this decision flows directly from our precedent, Washington case law provides no guidance as to how a court is to consider the allegedly seized person's race or ethnicity because we have never done so before. Moreover, some of the analysis offered in this case indicates there is a need to reiterate that the seizure inquiry depends on the totality of the circumstances, rather than a list of factors. We therefore clarify the seizure inquiry, taking guidance from GR 37. In doing so, we do not disavow our precedent, and we do not suggest that any particular case would have had a different outcome pursuant to the clarification we announce today.

> 1.  The seizure analysis must properly account for all the circumstances of Sum's encounter with Deputy Rickerson

On the ultimate question of when Sum was seized, the State contends that "Sum was not seized until he drove off at a high rate of speed, over grass and the sidewalk, and Deputy Rickerson activated his lights in pursuit." Answer to Pet. for Review at 18. To reach this conclusion, the State focuses on the circumstances that were *not* present in Sum's encounter with Deputy Rickerson. For instance, as the State correctly notes, there were not multiple officers, Deputy Rickerson did not physically block Sum's car from leaving, the deputy did not "activate[ ] his lights or siren," and he did not "display[ ] his weapon, physically touch[ ] Sum, or use[ ] language or tone indicating mandatory compliance." Suppl. Br. of Resp't at 29-30. The Court of Appeals took a similar approach in its seizure analysis. *See*

25

*Sum*, No. 53924-1-II, slip op. at 8. Likewise, the trial court appears to have placed dispositive weight on the fact that Deputy "Rickerson did not retain [Sum]'s physical identification to conduct his records check"; that was the only reason the court identified in its written ruling concluding that Sum was not seized. Suppl. CP at 89.

Without question, each of those circumstances, if present, would weigh in favor of holding that Sum was seized. *See, e.g.*, *Rankin*, 151 Wn.2d at 710. However, the lack of those particular circumstances fails to show that Sum was *not* seized. To the contrary, because the seizure inquiry depends on "all the circumstances," there will always be factual distinctions between cases. *Id.* at 695. As a result, our precedent requires courts to carefully assess "all surrounding circumstances" that *are* presented in each encounter, rather than focusing on the circumstances that are *not* presented, or considering each encounter against a predetermined set of factors. *Id.* at 710. Nevertheless, we recognize that this requirement can be difficult to apply with consistency and objectivity. We therefore take this opportunity to clarify the article I, section 7 seizure analysis as a matter of independent state law.

2. GR 37 appropriately guides our clarification of the seizure inquiry

In order to provide courts and parties with a clearer framework for conducting an article I, section 7 seizure analysis, we take guidance from GR 37.

26

*State v. Sum*, No. 99730-6

GR 37 was adopted to bring increased clarity, consistency, and justice to jury selection, an area of law where all three qualities have long proved elusive. Many of the same concerns arise in the context of warrantless seizures.

This court adopted GR 37 in an effort "to eliminate the unfair exclusion of potential jurors based on race or ethnicity." GR 37(a). GR 37 replaces the *Batson* test, which "has done very little to make juries more diverse or to prevent prosecutors from exercising race-based challenges." *Jefferson*, 192 Wn.2d at 240 (Gordon McCloud, J., lead opinion). The differences between GR 37 and *Batson* are informative in contexts beyond jury selection, including the seizure analysis required by article I, section 7.

For instance, in order to bring a successful *Batson* challenge, a defendant must show that a peremptory challenge was motivated by "purposeful discrimination." 476 U.S. at 98. GR 37, by contrast, provides that a "court need not find purposeful discrimination" and, instead, must deny the peremptory challenge if "an objective observer could view race or ethnicity as a factor." GR 37(e). This shift away from purposeful discrimination "take[s] the focus off of the credibility and integrity of the attorneys and ease[s] the accusatory strain of sustaining a *Batson* challenge," which "simplif[ies] the task of reducing racial bias in our criminal justice system, both conscious and unconscious." *Saintcalle*, 178 Wn.2d at 54 (Wiggins, J., lead opinion).

27

*State v. Sum*, No. 99730-6

Similar concerns are presented in the warrantless seizure context, where it is well known that BIPOC are wrongfully subject to excessive police scrutiny. *See, e.g.*, *Strieff*, 579 U.S. at 254 (Sotomayor, J., dissenting); *Knights*, 989 F.3d at 1295-98 & nn.6-8 (Rosenbaum, J., concurring). Nevertheless, purposeful, explicit discrimination may be absent or impossible to prove in individual cases because "identifying the influence of racial bias generally, and implicit racial bias specifically, presents unique challenges." *Berhe*, 193 Wn.2d at 657. Beyond the problem of proof, GR 37's rejection of the need to show purposeful discrimination also better aligns with the objective seizure inquiry required by our precedent, which holds that the "subjective intent of police is irrelevant to the question [of] whether a seizure occurred unless it is conveyed to the defendant." *O'Neill*, 148 Wn.2d at 575.

Another relevant difference between *Batson* and GR 37 is that *Batson* permits a party to exercise their peremptory challenges on an apparently discriminatory basis, so long as the party can "articulate a neutral explanation" to justify their actions. 476 U.S. at 98. The list of potential "neutral explanations" is limitless, and "[p]roffered reasons sometimes involve subtle observations about a prospective juror's appearance or demeanor, which are easily alleged but often extremely difficult to scrutinize." *Saintcalle*, 178 Wn.2d at 93 (González, J., concurring). GR 37 addresses this concern by specifying that "allegations that the

28

*State v. Sum*, No. 99730-6

prospective juror was sleeping, inattentive, or staring or failing to make eye contact; exhibited a problematic attitude, body language, or demeanor; or provided unintelligent or confused answers" cannot be a valid basis for a peremptory challenge without "corroboration by the judge or opposing counsel verifying the behavior" because such allegations "have historically been associated with improper discrimination in jury selection in Washington State." GR 37(i). Moreover, as noted above, GR 37 also provides a list of presumptively invalid reasons for exercising peremptory challenges, such as prior contacts with, and distrust of, law enforcement, which "have been associated with improper discrimination in jury selection in Washington State." *Id.* at (h).

These presumptively invalid reasons for exercising peremptory challenges reflect that unless carefully drawn, facially neutral standards can have a disproportionate impact in jury selection. The same is true in the seizure context. As discussed above, BIPOC are subject to excessive police contacts, investigative seizures, and uses of force by law enforcement. Moreover, the BIPOC community, as a whole, is generally well aware of such patterns of excessive police scrutiny. As a result, "generations of children have had to grow up with 'the Talk,'" in which parents must educate their children "about how to interact with law enforcement so no officer will have any reason to misperceive them as a threat and take harmful or fatal action against them." *Knights*, 989 F.3d at 1297 & n.8

29

*State v. Sum*, No. 99730-6

(Rosenbaum, J., concurring). "Against that awareness," an encounter with law enforcement would certainly feel "more pointed and coercive." *Dozier*, 220 A.3d at 943. Thus, "[t]he fear of harm and resulting protective conditioning to submit to avoid harm at the hands of police is relevant to whether there was a seizure because feeling 'free' to leave or terminate an encounter with police officers is rooted in an assessment of the consequences of doing so." *Id.* at 944.

A final relevant point of comparison between *Batson* and GR 37 is the perspective from which the ultimate determination is made. A successful *Batson* challenge requires the trial judge to "decide[ ] that the facts establish, prima facie, purposeful discrimination," and that the State failed to "come forward with a neutral explanation for [its] action." 476 U.S. at 100. However, *Batson* does not specify from whose perspective "purposeful discrimination" and "neutral explanations" are to be evaluated. As a result, "[g]iven the inevitably clumsy fit between any objectively measurable standard and the subjective decisionmaking at issue, [we should not be] surprised to find studies and anecdotal reports suggesting that, despite *Batson*, the discriminatory use of peremptory challenges remains a problem." *Miller-El v. Dretke*, 545 U.S. 231, 268, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005) (Breyer, J., concurring) (collecting articles and studies).

GR 37 seeks to address this problem by explicitly providing that (1) the analysis must be made from the perspective of "an objective observer," (2) the

30

*State v. Sum*, No. 99730-6

necessary showing is made if the objective observer "*could* view race or ethnicity as a factor in the use of the peremptory challenge," and (3) an objective observer "is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in the unfair exclusion of potential jurors in Washington State." GR 37(e)-(f) (emphasis added). Thus, "GR 37 was written in terms of possibilities, not actualities," and the rule "teaches that peremptory strikes exercised against prospective jurors who appear to be members of racial or ethnic minority groups must be treated with skepticism and considerable caution." *State v. Lahman*, 17 Wn. App. 2d 925, 938, 488 P.3d 881 (2021).

The seizure context presents similar issues. Washington's seizure test is intended to be "'a purely *objective* one'" based on what a hypothetical "reasonable person" in the defendant's position would have believed under the same circumstances. *O'Neill*, 148 Wn.2d at 574 (quoting *Young*, 135 Wn.2d at 501). However, without more specific guidance, the perspective of a "reasonable person" is measured from the perspective of the judicial decision-maker. Judicial officers are especially well situated to know their legal rights and may also be unusually likely to expect that their rights, if asserted, will be respected by law enforcement. This commonsense observation is not to suggest that judicial perspectives are unreasonable; we merely acknowledge that it is unrealistic to equate the perspective of a judicial officer with the perspective of a "reasonable person" in

31

*State v. Sum*, No. 99730-6

this context. Therefore, following GR 37's example and reframing the seizure inquiry to focus on what an objective observer could believe about a person's encounter with law enforcement provides a valuable safeguard.

Thus, there are relevant parallels between the contexts of jury selection and warrantless seizures, showing that GR 37 should guide our clarification of the seizure inquiry.

3.  We now clarify the analysis that courts must apply when determining whether a person has been seized by law enforcement

As provided by our precedent, the article I, section 7 seizure inquiry is an objective test in which the allegedly seized person has the burden of showing that a seizure occurred. *Id.* To properly apply this test, we now clarify that a person has been seized as a matter of independent state law if, based on the totality of the circumstances, an objective observer could conclude that the person was not free to leave, to refuse a request, or to otherwise terminate a police encounter due to law enforcement's display of authority or use of physical force. For purposes of this analysis, an objective observer is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in disproportionate police contacts, investigative seizures, and uses of force against BIPOC in Washington.

Moreover, in determining whether there has been a seizure in light of all the circumstances of the encounter, courts may take guidance from some of the

circumstances specified in GR 37, in addition to case law and the contentions of the parties. For instance, "the number and types of questions posed" or requests made of the allegedly seized person, and the extent to which similar law enforcement encounters are "disproportionately associated with a race or ethnicity" may be relevant considerations, among others. GR 37(g)(i), (iv).

Finally, in accordance with our precedent, if the person shows that there was a seizure, then the burden shifts to the State to prove that the seizure was supported by a warrant or "was justified by an exception to the warrant requirement." *Rankin*, 151 Wn.2d at 695. Our opinion today is not intended to modify or clarify the warrant requirement or any of its exceptions.

D.     Given the totality of the circumstances, we hold that Deputy Rickerson
       seized Sum before Sum identified himself with a false name and birth date

As discussed above, although Sum's race is relevant to the seizure inquiry, it is certainly not dispositive. We must instead consider all of the circumstances to determine whether an objective observer could conclude that Sum was not free to refuse Deputy Rickerson's request for identification based on the deputy's display of authority. The answer is yes.

The circumstances, as found by the trial court, were as follows. Sum, a person of color, was asleep in his car, which was parked on a public street in a "high-crime area." Suppl. CP at 88. At 9:15 in the morning, Sum was awoken by a sheriff's deputy in full uniform knocking on the car window next to where Sum

33

was sleeping. Deputy Rickerson did not ask about Sum's health or safety, and he

did not ask if Sum and his passenger required assistance. Instead, the deputy asked

what Sum and his passenger were doing, clearly implying that they did not belong

there.

Sum answered that "they were visiting a friend across the street." *Id.* at 86.

This answer proved insufficient to satisfy the deputy's interest in Sum and his

passenger because Deputy Rickerson next asked "to whom the Honda Civic

belonged." *Id.* Sum provided a name, but this also failed to satisfy the deputy

because he then requested Sum's identification.[7] When Sum "asked him why he

wanted" identification, the deputy "explained that the two men were sitting in an

area known for stolen vehicles and that [Sum] did not appear to know to whom the

vehicle he was sitting in belonged." *Id.* at 86-87.

Assuming, without deciding, that Sum was not already seized, then Deputy

Rickerson's explanation was certainly "the tipping point at which the weight of the

---

[7] Sum contends that "Rickerson's 'request' for information is properly characterized as a demand," while the State contends that it is an unchallenged "verity on appeal" that "the deputy 'inquired' if Sum had identification." Suppl. Br. of Pet'r at 8; Suppl. Br. of Resp't at 30 (quoting Suppl. CP at 86). We decline to settle this debate. It is certainly true that factors such as an officer's "'tone of voice'" can be relevant to the seizure inquiry. *Young*, 135 Wn.2d at 512 (quoting *Mendenhall*, 446 U.S. at 554). A trial court's findings as to such factors may support the legal conclusion that the officer "'demand[ed] information from the person'" on the basis that a reasonable person would have not have felt free to refuse. *O'Neill*, 148 Wn.2d at 577 (quoting *State v. Cormier*, 100 Wn. App. 457, 460, 997 P.2d 950 (2000)); *see also State v. Carriero*, 8 Wn. App. 2d 641, 658, 439 P.3d 679 (2019). However, a court's decision to use a particular word to describe an officer's request is neither a question of fact nor a separate component of the seizure inquiry.

34

*State v. Sum*, No. 99730-6

circumstances transformed a simple encounter into a seizure." *Johnson*, 8 Wn. App. at 745. At that point, it would have been clear to any reasonable person that Deputy Rickerson wanted Sum's identification because he suspected Sum of car theft. Indeed, the deputy stated as much, and we have recognized that law enforcement's subjective intent is relevant if "it is conveyed to the defendant." *O'Neill*, 148 Wn.2d at 575. "[T]he number and types" of Deputy Rickerson's questions and requests further indicated his investigative purpose, despite the lack of reasonable suspicion. GR 37(g)(i). It is also "no secret" that "suspicionless stop[s]" are "disproportionately associated" with people of color. *Strieff*, 579 U.S. at 254 (Sotomayor, J., dissenting) (emphasis omitted); GR 37(g)(iv).

Thus, this case is not like others in which we have held that a seizure does not occur "merely because a police officer engages [a person] in conversation in a public place and asks for identification." *Contra* Suppl. Br. of Resp't at 26 (citing *State v. Harrington*, 167 Wn.2d 656, 664-65, 222 P.3d 92 (2009); *O'Neill*, 148 Wn.2d at 577-78; *Young*, 135 Wn.2d at 511; *State v. Armenta*, 134 Wn.2d 1, 11, 948 P.2d 1280 (1997)). There were far more circumstances at play here.

Based on the totality of the circumstances, an objective observer could easily conclude that if Sum had refused to identify himself and requested to be left alone, Deputy Rickerson would have failed to honor Sum's request because the deputy was investigating Sum for car theft. In other words, an objective observer could

35

conclude that Sum was not free to refuse Deputy Rickerson's request due to the deputy's display of authority. At that point, Sum was seized. As the State correctly concedes, this seizure was not supported by a warrant, reasonable suspicion, or any other authority of law.

Thus, the false name and birth date that Sum gave to Deputy Rickerson was the product of an unlawful seizure. Sum's false statement must be suppressed because "[o]ur state exclusionary rule requires the suppression of evidence obtained in violation of article I, section 7." *Mayfield*, 192 Wn.2d at 888.

CONCLUSION

Today, we formally recognize what has always been true: in interactions with law enforcement, race and ethnicity matter. Therefore, courts must consider the race and ethnicity of the allegedly seized person as part of the totality of the circumstances when deciding whether there was a seizure for purposes of article I, section 7. Here, in light of all the circumstances of Sum's encounter with Deputy Rickerson, we hold that Sum was unlawfully seized before he provided a false name and birth date to the deputy, so his false statement must be suppressed. We reverse the Court of Appeals and remand to the trial court for further proceedings consistent with this opinion.

Yu, J.

WE CONCUR:

González, C.J.

Stephens, J.

Johnson, J.

Gordon McCloud, J.

Madsen, J.

Whitener, J.

Owens, J.

Coburn, J.P.T.